UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RESCUECOM CORP.,

               Plaintiff/Counter-Defendant,

v.                                     5:07-CV-0690
                                     (GTS/GHL)

JONATHAN CHUMLEY; and
OSI CONSULTING, LLC,

               Defendants/Counter-Claimants,

_____

APPEARANCES:                          OF COUNSEL:

LYNCH & ROBBINS                EDMUND J. GEGAN, ESQ.
  Counsel for Plaintiff
2639 Dr. Martin Luther King Street N
St. Petersburg, FL 33704

JONATHAN CHUMLEY
  Defendant, *Pro Se*
239 Hanging Moss Trail
Shreveport, LA 71106

OSI CONSULTING, LLC
  Defendant
9857 High Point Drive
Shreveport, LA 71106

HON. GLENN T. SUDDABY, United States District Judge

## **MEMORANDUM-DECISION and ORDER**

     Currently before the Court in this breach-of-contract action, filed by Rescuecom

Corporation ("Plaintiff") against Jonathan Chumley ("Defendant Chumley") and OSI

Consulting, LLC ("Defendant OSI"), are the following four motions: (1) Plaintiff's motion for

summary judgment (Dkt. No. 70); (2) Defendants' motion to strike the reply affidavit of

Plaintiff's attorney (Dkt. No. 91); (3) Plaintiff's motion to strike Defendants' Answer and enter

judgment of default against Defendants (Dkt. No. 120); and (4) Defendant Chumley's motion to permit him to represent himself *pro se* and to set aside the Clerk's Entry of Default against him (Dkt. Nos. 126-127).  For the reasons set forth below, Plaintiff's motion for summary judgment is granted in part and denied in part, and decision is reserved on that motion in part; Defendants' motion to strike the reply affidavit of Plaintiff's attorney is denied as moot; Plaintiff's motion to strike Defendants' Answer and enter default judgment against Defendants is granted in part and denied in part; and Defendant Chumley's motion to permit him to represent himself *pro se* and to set aside the Clerk's Entry of Default against him is granted.

## TABLE OF CONTENTS

I.  RELEVANT BACKGROUND................................................................................4
    A.  Plaintiff's Claims.......................................................................................4
    B.  Defendants' Counterclaims.......................................................................6
    C.  Plaintiff's Motion for Remand..................................................................7
    D.  Undisputed Material Facts on Plaintiff's Motion for Summary Judgment..........8
        1.  Facts About Rescuecom...................................................................8
        2.  Facts About Defendants...................................................................9
        3.  Defendants' Problems with Their Rescuecom Account....................10
        4.  Notice of Default Pursuant to Franchise Agreement and
            Subsequent Termination of Defendants' Franchise.........................11
        5.  Stipulated-Damages Provision in Franchise Agreement  . . . . . . . . . .12
        6.  Credits Owed to Defendants...........................................................13
    E.  Arguments on Plaintiff's Motion for Summary Judgment........................13

II.  RELEVANT LEGAL STANDARDS .............................................................16
    A.  Legal Standard Governing Motions for Summary Judgment......................16
    B.  Legal Standards Governing Plaintiff's Claims ........................................17

III.  ANALYSIS.......................................................................................................17
    A.  Plaintiff's Breach-of-Contract Claim.......................................................17
        1.  Whether Defendants Defaulted Under the Franchise Agreement..........18
        2.  Whether the Stipulated Damages Provision Is Enforceable................20
    B.  Attorney's Fees........................................................................................25
    C.  Defendants' Counterclaims......................................................................26
        1.  Fraud-Related Counterclaims.........................................................27
        2.  Counterclaims for Negligent Misrepresentation and
            Breach of Fiduciary Duty...............................................................30
        3.  Counterclaim for Quantum Meruit..................................................31
        4.  Counterclaim for Breach of Contract..............................................32
        5.  Counterclaims for Conversion.........................................................34
        6.  Counterclaims for Unjust Enrichment and Quantum Meruit................35
        7.  Counterclaim for Violation of N.Y. Gen. Bus. Law § 687................36
        8.  Defendants' Counterclaim for Violation of
            Louisiana Statute 51:122................................................................38
    D.  Defendants' Motion to Strike Plaintiff's Reply........................................38
    E.  Plaintiff's Motion for Default Judgment and Defendant Chumley's
        Motion to Set Aside the Entry of Default Against Him..............................39
        1.  Clerk's Entry of Default Against Defendant Chumley......................40
        2.  Motion for Default Judgment Against Defendant OSI......................42

## I.      RELEVANT BACKGROUND

### A.      Plaintiff's Claims

On or about June 8, 2007, Plaintiff filed this breach-of-contract action against Defendants in Supreme Court for Onondaga County.  (Dkt. No. 1, Attach. 2 [Plf.'s Compl.].)  On or about July 3, 2007, Defendants removed this action to this Court.  (Dkt. No. 1, Attach. 1 [Defs.' Notice of Removal].)  Generally, liberally construed, Plaintiff's Complaint alleges as follows.  (*See generally* Dkt. No. 1, Attach. 2.)

Plaintiff is a computer services franchisor, offering and selling franchised computer services businesses nationwide.  Plaintiff's franchisees offer computer services, including computer consulting, repair, and Internet services to business and residential customers.

On January 25, 2006, Plaintiff entered into a franchise agreement with Defendant Chumley, which authorized him to operate one of Plaintiff's franchises under the terms and conditions of the Rescuecom Corporation Franchise Agreement ("the Franchise Agreement"). The Franchise Agreement executed between the parties provides, among other things, as follows: (1) it is governed by the laws of the State of New York; (2) either the franchisor or the franchisee may terminate the Franchise Agreement for cause "upon any grounds available by law, following written advanced notice to the other party and thirty days opportunity to cure"; (3) in the event of termination by Plaintiff based on the franchisee's default, the franchisee is responsible for paying all sums owed, reasonable attorney's fees, and stipulated damages in the amount of 18% of the projected Total Sales and 50% of the projected Gross Product Profit that Defendant Chumley would have earned each month, multiplied by the number of months remaining on the term of the Franchise Agreement period; and (4) the franchisee may not

compete with Plaintiff for a period of two years after the expiration or termination of the Franchise Agreement.  The term of the Franchise Agreement was five years, with an agreed upon termination date of January 25, 2011.

On September 19, 2006, Plaintiff forwarded a notice of default under the Franchise Agreement to Defendant Chumley.  Plaintiff notified Defendant Chumley that his defaults were based on his failure to pay (1) amounts owed to Tech Data, a third party supplier with which Plaintiff has an account, (2) royalties, (3) handheld-device fees, and (4) fees owed for local advertising.  The total amount owed by Defendant Chumley based on these defaults was $16,653.80.

On October 25, 2006, Plaintiff forwarded a notice of termination of the Franchise Agreement to Defendant Chumley.  On the date of termination, Defendant Chumley owed Plaintiff $6,793.84; and 50 months remained on the franchise period.  The monthly average royalties on Defendant Chumley's total sales for services was $893.73, and the monthly average royalties on Defendant Chumley's Gross Product Profit was $205.77.  Based on these figures, the stipulated damage amount owed by Defendant Chumley is $54,975.00.  In addition, Defendant Chumley took payments from Plaintiff's customers for prepaid services in at least the sum of $2,665.00, which Plaintiff must now perform.

Based on these allegations, Plaintiff seeks damages for Defendant Chumley's alleged breach of contract in the total amount of $125,433.84, plus interest from the date of termination, costs and disbursements, including attorney's fees.  Plaintiff also seeks an injunction, enjoining Defendant Chumley from (1) soliciting or doing business with any customers for whom he or Defendant OSI previously performed services, or sold product while he operated the franchise, (2) diverting or attempting to divert business or customers of the franchised business to any

competitor, and (3) identifying himself as a franchisee or former franchisee of Plaintiff.

Familiarity with the remaining factual allegations supporting Plaintiff's claims of breach of contract is assumed in this Decision and Order, which is intended primarily for the review of the parties.  (*Id.*)

### B.    Defendants' Counterclaims

On December 12, 2008, Defendants filed an Amended Answer, which asserts twelve counterclaims.  (Dkt. No. 54.)  More specifically, Defendants assert as counterclaims the following: (1) fraudulent inducement based on Plaintiff allegedly engaging in a pattern of conduct, which was intended to and did misrepresent the facts of the franchise opportunities, thereby fraudulently inducing Defendants to enter into the Franchise Agreement and expend money, time and labor on the franchise and business that was developed based on it; (2) intentional misrepresentation based on Plaintiff (a) permitting Defendants to provide services to a national client, Amptek, whom Plaintiff knew would not pay Defendants for services performed because of a credit owed for work not done by Plaintiff, and (b) compelling Defendants to use inadequate communications equipment and charge card and vendor billing, charging fees for services not rendered, and charging account fees that resulted in overdraft charges; (3) rescission based on the aforementioned conduct by Plaintiff; (4) fraud based on the aforementioned conduct by Plaintiff; (5) negligent misrepresentation based on the aforementioned conduct by Plaintiff; (6) quantum meruit based on the aforementioned conduct by Plaintiff; (7) breach of contract based on (a) Plaintiff engaging in the aforementioned conduct, (b) Plaintiff failing to pay Defendants for certain monies collected from customers, and (c) David Milman, Plaintiff's CEO, backdating his signature on the Franchise Agreement; (8) breach of fiduciary duty based on the aforementioned conduct by Plaintiff, and the fact that the

parties were in unequal bargaining positions when the Franchise Agreement was executed; (9)

conversion based on Plaintiff (a) billing Amptek for work not actually done, collecting royalties

on this work, and then collecting royalties from Defendants for services they performed for

Amptek, but for which they were not paid, and (b) failing to remit monies from credit card

payments made by Defendants' customers for services rendered by Defendants; (10) unjust

enrichment and quantum meruit based on Plaintiff taking money from clients whom Defendants

serviced and not paying Defendants; (11) violation of N.Y. Gen. Bus. Law § 687 based on

Plaintiff's false statements and material misrepresentations in its Franchise Agreements and

other documents and communications regarding the management and operation of the

Rescuecom Franchise; and (12) violation of Louisiana Statute 51:122 based on the unreasonable

restrictions in the non-compete clause in the Franchise Agreement.  (*Id*.)

Familiarity with the remaining factual allegations supporting Defendants' counterclaims

is assumed in this Decision and Order, which is intended primarily for the review of the parties.

(*Id*.)

####     C.      Plaintiff's Motion for Remand

On July 13, 2007, Plaintiff requested that the Court hold a pre-motion conference to

assist

the parties in resolving their disagreement over whether the matter should be remanded to state

court.  (Dkt. No. 6.)  Plaintiff argued that remand was appropriate because the amount in

controversy–both as alleged in its Complaint and as established by extrinsic evidence outside the

four corners of that Complaint–did not exceed $75,000.  (*Id*.)  On July 18, 2007, that conference

was held, and it was decided that the parties would brief the issue, by letter, of whether remand

was appropriate in this case.  (*See* Docket Minute Entry for 7/18/07.)

In its letter-brief, Plaintiff conceded that the amount in controversy in this case is $64,433.84, excluding reasonable attorney's fees.  (Dkt. No. 13.)  Based on this concession, Plaintiff argued that the amount in controversy did not exceed $75,000.  (*Id*.)  In adopting the thorough Report-Recommendation issued by United States Magistrate Judge George H. Lowe, the United States District Judge then assigned to the case, Frederick J. Scullin, Jr., concluded that an award of attorney's fees should be included in the total amount of damages alleged for jurisdictional purposes, under the circumstances.  (Dkt. No. 31.)  District Judge Scullin further concluded that, based on the applicable language in the Franchise Agreement, the fees amount to 25% of $64,433.84, or $16,108.46.  (*Id*.)  As a result, District Judge Scullin concluded that the Court possessed jurisdiction over this action.  (*Id*.)

## D.   Undisputed Material Facts on Plaintiff's Motion for Summary Judgment

The following is a general summary of material facts that are undisputed by the parties. (*Compare* Dkt. No. 70, Attach. 2 [Plf.'s Rule 7.1 Statement] *with* Dkt. No. 78 [Defs.' Rule 7.1 Response].)

### 1.   Facts About Rescuecom

Rescuecom Corporation is a computer services company operating in Syracuse, New York, which offers franchise opportunities to prospective franchisees.  Rescuecom was founded by David Milman.  The systems which Rescuecom sells as supports to its business model include the following: SystemOne, SystemOne 2-way handheld devices ("handhelds"), and the Rescuecom call center.[1]  The Rescuecom business model also includes billing and full accounting systems.

---

[1]      The SystemOne 2-way handhelds are a proprietary product of Rescuecom.

Franchisees are required to pay a one-time activation fee for each 2-way handheld. Franchisees are also required to pay to Plaintiff a weekly fee, representing a continuing license fee, as well as monthly local advertising fees.

In its promotional materials, Plaintiff states, "Our call center is selling for you 24/7/365, so you will not have to worry about acquiring new customers."  In addition, Plaintiff represents to prospective franchisees that the call center will take service calls from Rescuecom customers and transmit the calls to the local franchisee in real time through Defendants' handhelds. However, during the time that Defendants operated their franchise, they experienced delays of multiple hours to receive calls on their handhelds, and sometimes they never received the calls at all.

Finally, in its promotional materials, Plaintiff represents that franchisees will be able to order parts, hardware and software directly from the handhelds.  However, during the time that they operated their franchise, Defendants were generally unable to place such orders because of consistent problems with their handhelds.

### 2.    Facts About Defendants

Defendant Chumley is an individual residing in Shreveport, Louisiana.  Defendant OSI was a limited liability company organized and operated pursuant to the laws of Louisiana.  Prior to becoming a Rescuecom franchisee, Defendant Chumley spoke with Robert Jemison, a Rescuecom employee, who made statements to him regarding SystemOne, the call center, handhelds, and the work that he could perform for Amptek (a national client)–all of which influenced his decision to enter into the Franchise Agreement.  In particular, Mr. Jemison stated that SystemOne and the call center would provide Defendant Chumley with the support he needed to manage a computer business, and ensure that his customers were always able to speak

to a live representative.  Mr. Jemison also stated that Amptek would provide Defendant Chumley with enough work to recoup the cost of the franchise.

In addition, prior to becoming a franchisee, Defendant Chumley reviewed written materials, provided to him by Rescuecom.  These written materials contained statements that represented that SystemOne, the handhelds and the call center were functional and reliable. Defendant Chumley relied on these statements in making his decision to purchase a Rescuecom franchise.

### 3.    Defendants' Problems with Their Rescuecom Account

On or about January 24, 2006, Defendant Chumley signed the Franchise Agreement on behalf of himself individually and Defendant OSI.  Defendants began operating a franchised Rescuecom computer services business under the name and trademark of "Rescuecom" in the Shreveport, Louisiana area.

After entering into the Franchise Agreement and becoming a franchisee, Defendants attempted to set up a merchant account; however, they were unable to do so.  As a result, they could not process credit card payments.  Defendants therefore asked Plaintiff to process credit card payments from customers to whom Defendant Chumley provided services.  Plaintiff processed the credit card payments, but failed to timely remit any of the payments to Defendants' franchisee account.  Nonetheless, Plaintiff withdrew monies from Defendants' account representing the royalties and advertising fund fees for these credit card payments.

At an unidentified point in time, Defendants performed service work for Amptek, a national client.  After performing the work, Defendant Chumley learned that other Rescuecom franchisees had over-billed Amptek.  Because of this over-billing, Amptek did not pay

Defendants, but instead used Defendants' work as a credit to off-set monies owed.[2]  Despite

knowing that Defendants had not been paid for certain work performed, Plaintiff withdrew

monies from Defendants' account for royalties and advertising fund payments.

As a result of incorrect information in SystemOne, Defendants had difficulty with their

account.  Defendants hired an accounting firm to balance their account in August 2006.  Between

August and the first few weeks in September 2006, Defendants communicated with Plaintiff

regarding any progress and issues pertaining to their account.

### 4.   Notice of Default Pursuant to Franchise Agreement and Subsequent Termination of Defendants' Franchise

Despite Defendants' efforts to determine the amounts owed and resolve any outstanding

issues regarding fees due to Plaintiff, Defendants received a Notice of Default pursuant to the

Franchise Agreement, on or about September 19, 2006.  The Notice of Default allowed

Defendants thirty (30) days to cure or make reasonable efforts to cure the alleged default.  The

Notice of Default stated, "if for any reason a complete cure or correction is not possible within

such a period of time, you must show that you have made all reasonable efforts to affect such

cure or correction."

The Notice of Default alleged that Defendants violated the Franchise Agreement by,

among other things, failing to pay the local advertising fees in the amount of $11,200.  However,

David Milman had agreed to waive Defendants' monthly advertising fee until the Amptek non-

payment issue was resolved, and as of September 19, 2006, it had not been resolved.

On October 5, 2006, Defendant Chumley was copied on an email message from David

---

[2]   Pursuant to the terms of the Franchise Agreement, Defendant Chumley could not refuse to do work on a national account for six months.

Milman to Ed Gegan, Plaintiff's Corporation Counsel, which stated, "Ed, [p]lease do whatever is necessary to shut down [Defendant] Chumley's franchise.  He has been non-responsive and has not paid [Plaintiff] in over [one] month[, and] possibly two."

At some point after receiving this email message, Defendants hired Kenneth Mascagni to negotiate with Plaintiff to resolve the outstanding issue of amounts owed and cure the alleged default.  On October 18, 2006, Gegan sent an email message to Mascagni stating that Defendants were to pay the entire amount set forth in the default letter with all amounts due and owing since September 19, 2006.  On or about October 24, 2006, Mascagni attempted to cure the default, but Gegan responded by email message, rejecting Defendants' response as "untimely and insufficient."  Gegan further stated that Defendants' period to cure had expired, but that, if Defendants paid the entire amount claimed due by Plaintiff, the termination of Defendants' franchise would be voided.

On October 25, 2006, Plaintiff sent Defendants a Notice of Termination.  On October 26, 2006, Gegan sent Mascagni an email message, stating that Defendants "could no longer cure [their] default."  The email message further stated that "conversations [previously held] about curing th[e] default were . . . off the table," and all new negotiations would pertain to Defendants re-starting their franchise, which would require a  security deposit of $5,000 in addition to paying all amounts owed.

###### 5.  Stipulated-Damages Provision in Franchise Agreement

The Stipulated Damages provision in the Franchise Agreement provides that, upon termination of the Franchise Agreement due to Defendants' default, damages for lost future royalties shall be calculated by formula.  The Stipulated Damages formula uses the actual royalties paid by Defendants over a six-month period and extrapolates that amount over the

remaining term of the Franchise Agreement, to arrive at a damages amount of $54,975.08.[3]

### 6.     Credits Owed to Defendants

Defendants were owed certain credits for royalties and fees taken by Plaintiff out of Defendants' business account for work performed by Defendants, for Amptek, for which Defendants were not paid.  Defendants were also owed certain credits for credit card payments by customers which Defendants asked Plaintiff to run through Plaintiff's merchant account because Defendants were unable to obtain a merchant account.  After deducting royalties and fees, Plaintiff calculated the amount owed for the credit card payments to be $1,053.43.[4]

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for the review of the parties.  (*Id.*)

### E.     Arguments on Plaintiff's Motion for Summary Judgment

Generally, in support of its motion for summary judgment, Plaintiff argues as follows: (1) it is entitled to summary judgment on its breach-of-contract claim, and stipulated damages in the amount of $54,975.08, because (a) it is undisputed that Defendants defaulted, and (b) the Stipulated Damages provision in the Franchise Agreement is enforceable; and (2) Defendants' counterclaims should be dismissed because Defendants have failed to adduce admissible record evidence establishing any of their counterclaims.  (*See generally* Dkt. No. 70, Attach. 1 [Plf.'s Memo. of Law].)

More specifically, with regard to Defendants' counterclaims, Plaintiff argues as follows:

---

[3]     Defendants deny that the Stipulated Damages are $54,975.08.

[4]     Defendants deny that this is the sum owed.

(1) Defendants' fraud-related claims must be dismissed because Defendants have failed to adduce admissible record evidence establishing that (a) Plaintiff made any false statements, (b) Plaintiff acted with fraudulent intent, or (c) as a result of their reliance on the alleged fraudulent statements, they suffered damages; (2) Defendants' claims of unjust enrichment and quantum meruit must be dismissed because (a) Defendants have failed to adduce admissible record evidence establishing breach of a promise or damages, and (b) these claims are precluded by the existence of an express contract; (3) Defendants' claim of rescission must be dismissed because (a) Defendants cannot rescind a contract that was already terminated due to default, and (b) Defendants have failed to adduce admissible record evidence establishing their fraud-related claims; (4) Defendants' conversion claim must be dismissed because Defendants admitted that Plaintiff did not take any of their property without authorization; (5) Defendants' claim for breach of fiduciary duty must be dismissed because (a) Defendants admitted that their allegations in support of this claim were false, and (b) Defendants have failed to adduce admissible record evidence establishing that the parties had a fiduciary or confidential relationship; and (6) Defendants' claim that Plaintiff violated a Louisiana statute that prohibits agreements restricting trade must be dismissed because a separate Louisiana state statute permits non-competition covenants in franchise agreements.[5]

    In Defendants' response to Plaintiff's motion for summary judgment, they argue as follows: (1) Plaintiff's motion for summary judgment should be denied because Plaintiff has

_____

        [5]        Plaintiff also argues that, because it "is not in possession of any evidence that Defendants have breached this [non-compete] provision, and Defendant [Chumley] has sworn during his deposition that he has not competed, but is employed in a non-computer related job[,] . . . enforcement of the restrictive covenants is moot."  (Dkt. No. 70, Attach. 1, at 24.)

14

failed to provide Defendants with necessary discovery; (2) Plaintiff's breach-of-contract claim must be dismissed because Plaintiff failed to provide Defendants with an opportunity to cure the alleged breach, in accordance with the terms of the Franchise Agreement; (3) Plaintiff's request for stipulated damages must be dismissed because the Stipulated Damages provision is unenforceable as a matter of law; (4) Defendants' fraud and misrepresentation-based counterclaims (i.e., Defendants' First, Second, Third, Fourth, and Fifth Counterclaims) should not be dismissed because (a) Plaintiff has failed to provide discovery relating to Plaintiff and its agents' knowledge of complaints about the ineffectiveness of Plaintiff's proprietary systems, (b) the limited admissible record evidence adduced by Defendants establishes that Plaintiff made false representations about is products, which Plaintiff knew, or should have known, were false at the time they were made, and which Defendants relied on in deciding to purchase their franchise, and (c) as a result of purchasing the franchise, Defendants suffered damages; (5) Defendants' counterclaim for violation of N.Y. Gen. Bus. Law § 687 should not be dismissed because Defendants have adduced admissible record evidence establishing that Plaintiff knew that its proprietary systems did not function as promised; (6) Defendants' counterclaim for breach of fiduciary duty should not be dismissed because Defendants have adduced admissible record evidence establishing that Plaintiff had "complete dominance" over Defendants' franchise, and the ability to withdraw funds from Defendants' accounts, which placed Plaintiff in a position akin to a trustee; (7) Defendants' counterclaim for conversion should not be dismissed because Defendants have adduced admissible record evidence establishing that Plaintiff took possession of certain monies due and owing to Defendants and maintained possession of this property after demand for its return was made; (8) Defendants' counterclaims for quantum meruit and unjust enrichment should not be dismissed because they are entitled to rescission, and

they have adduced admissible record evidence establishing that Plaintiff failed to pay them monies owed, despite a demand for this property.  (*See generally* Dkt. No. 79 [Defs.' Response Memo. of Law].)

In its reply, Plaintiff argues as follows: (1) Defendants' fraud-related counterclaims should be dismissed because Defendants have failed to adduce admissible record evidence establishing that they suffered damages as a result of Plaintiff's alleged fraud and/or misrepresentations; (2) Defendants' counterclaims arising out of Plaintiff's alleged knowledge that Amptek would not pay Defendants for work performed should be dismissed because Defendants have failed to adduce admissible record evidence establishing this knowledge; (3) Defendants' argument that Plaintiff failed to provide Defendants with an opportunity to cure the alleged breach, in accordance with the terms of the Franchise Agreement, is without merit; (4) the Stipulated Damages provision is enforceable; and (5) Defendants' argument that certain of their counterclaims should not be dismissed because Plaintiff has failed to provide discovery is without merit because Plaintiff has made available to Defendants the thousands of pages of documents requested, and Defendants have had sufficient time to review these documents, yet have chosen not to do so.  (*See generally* Dkt. No. 83 [Plf.'s Reply Memo. of Law].)

## II.    RELEVANT LEGAL STANDARDS

### A.    Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga County Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

## B.       Legal Standards Governing Plaintiff's Claims

Because the parties to this action have demonstrated, in their memoranda of law, an

accurate understanding of the relevant points of law contained in the legal standards governing

Plaintiff's claims and Defendants' counterclaims in this action, the Court will not recite, in their

entirety, those legal standards in this Decision and Order, which (again) is intended primarily for

the review of the parties.  (*See generally* Dkt. No. 70, Attach. 1 [Plf.'s Memo. of Law]; Dkt. No.

79 [Defs.' Response Memo. of Law]; Dkt. No. 83 [Plf.'s Reply Memo. of Law].)

## III.    ANALYSIS

## A.       Plaintiff's Breach-of-Contract Claim

As stated above in Part I.E. of this Decision and Order, Plaintiff seeks summary judgment

on its breach-of-contract claim because (1) it is undisputed that Defendants defaulted under the

Franchise Agrement, and (2) the Stipulated Damages provision in the Franchise Agreement is

enforceable.[6]

### 1.       Whether Defendants Defaulted Under the Franchise Agreement

Based on the current record, the Court accepts Plaintiff's first argument.  (*See* Dkt. No.

77, Attach. 25 at 3 [acknowledging, on October 25, 2006, that Defendants owe Plaintiff

---

[6]        Plaintiff seeks $5,393.84 in actual damages, $2,665.00 for "payments [that
Defendant Chumley has taken] from [Plaintiff's] customers for prepaid services," and
$54,975.00 in stipulated damages.  (Dkt. No. 70, Attach. 4, at ¶ 9 [stating a stipulated damages
amount of $54,975.00]; Dkt. No. 70, Attach. 15, at 4 [demonstrating royalty fees paid to Plaintiff
over the final six months of Defendants' franchise as $6,597.01, which equates to a monthly
royalty fee payment of $1,099.50, which, when multiplied by 50, i.e., the remaining months on
the franchise period, equals $54,975.00]; Dkt. No. 70, Attach. 15, at 1 [demonstrating actual
damages amount of $5,393.84]; Dkt. No. 70, Attach. 15, at 1, 7 [demonstrating as payments
Defendant Chumley took from Plaintiff's customers for prepaid services $2,665.00].)

$4,233.84, but disputing that Defendants owe $11,200 in local advertising, stating that Defendant "OSI has spent in excess of $16,000 for local advertising[, and] [i]nvoices reflecting that amount can be provided to [Plaintiff]"; Dkt. No. 77, at ¶ 57 [acknowledging that the amount of the default was not paid].)[7]

The Court would add only two points.  First, the fact that a provision exists in the Franchise Agreement that excuses Defendants from having to cure their default(s) if they show Plaintiff that they made "all reasonable efforts" to cure their defaults does not mean that Plaintiff is indefinitely prohibited from terminating the franchise relationship.  Second, the record evidence establishes that Defendants did not make "all reasonable efforts" to cure their defaults. Rather, the record evidence establishes that Defendants attempted to (1) re-negotiate the amount due and owing for royalty and Handheld fees, and (2) altogether avoid paying local advertising fees.

For example, the Notice of Default letter indicated that Defendants owed $5,453.84 to Tech Data for royalties and Handheld fees, and $11,200 for local advertising, and that Defendants had 30 days (i.e., until October 19, 2006) to either pay these amounts or "mak[e] alternate arrangements with [Plaintiff], in writing," otherwise the Franchise Agreement would be terminated.[8]  On October 18, 2006, Defendants' attorney contacted Plaintiff's corporate counsel in an effort to resolve Defendants' default.[9]  On October 24, 2006, Defendants' attorney acknowledged, in an email message, that Defendants have "an outstanding balance of

---

[7]     The Court notes that Defendants failed to adduce admissible record evidence establishing that they provided Plaintiff with an accounting of local advertising paid.  (*See generally* Docket Sheet.)

[8]     (Dkt. No. 77, Attach. 23, at 2.)

[9]     (Dkt. No. 75, Attach. 25, at 45.)

$4,233.84," but asked that Plaintiff provide Defendants with documentation supporting the additional $1,220 that Plaintiff claimed they owed for royalty and Handheld fees.[10]  In that same email message, Defendants' attorney stated that Defendants did not owe Plaintiff $11,200 in local advertising fees because Defendants had already paid $16,000 for local advertising, and Defendants would provide invoices reflecting that this amount was paid.[11]  On October 25, 2006, Defendants' attorney sent Plaintiff's corporate counsel a letter, in which he (1) asked again that Plaintiff provide Defendants with the documentation supporting $1,220 of the claimed debt owed for royalty and Handheld fees, and (2) indicated, among other things, that Defendants would be providing "documentation reflecting payment of local advertising."[12]  Enclosed with the letter were two checks, delivered in satisfaction of the $4,233.84 debt that Defendants acknowledged owing.[13]  On that same day, in an email message, Plaintiff's corporate counsel rejected the delivered checks as "untimely and insufficient."[14]  In that same email message, Plaintiff's corporate counsel indicated that (1) Defendants had until 5:00 p.m. the following day to cure their default, (2) Plaintiff would waive Defendants' default based on their failure to make advertising contributions if Defendants provided "paid invoices showing paid advertising for the full amount demanded in the default letter" (i.e., $11,200), (3) any "disputed" charge could be "dealt with after Defendant Chumley pa[id] th[e] charges to [Plaintiff,]" which Plaintiff claimed were owed, (4) this was a "ONE TIME DEAL," and (5) if Defendants paid the entire amount

---

[10]     (Dkt. No. 77, Attach. 25, at 3.)

[11]     (*Id.*)

[12]     (Dkt. No. 77, Attach. 25, at 2.)

[13]      (*Id.*; *see also* Dkt. No. 77, Attach. 25, at 5.)

[14]     (Dkt. No. 77, Attach. 25, at 59.)

claimed due, Plaintiff would "void the termination of [Defendants'] franchise."[15]  On October 26, 2006, Plaintiff's corporate counsel sent Defendants' attorney an email message that (1) itemized Defendants' outstanding debt, (2) indicated that Defendants had past the "default and cure period," (3) explained that, as a result, the parties were "in a separate negotiation to restart up [Defendants'] franchise and void the termination," (4) required Defendants to pay, in addition to their outstanding debt, a security deposit of $5,000, which Plaintiff would "hold against future defaults," and (5) required Defendants to re-activate their business banking account (or set up a new one).[16]  Nonetheless, Defendants failed to (1) pay the entire outstanding debt, or (2) provide Plaintiff with invoices establishing that they paid local advertising fees and pay the remainder of the outstanding debt owed.[17]

## 2.     Whether the Stipulated Damages Provision Is Enforceable

Turning to Plaintiff's second argument, before evaluating the enforceability of the stipulated-damages provision, the Court must determine what state's law governs the parties' Franchise Agreementt.  Here, the Franchise Agreement has a choice-of-law provision, which provides that New York law governs the agreement.  Moreover, as Magistrate Judge Lowe already noted in his Report-Recommendation recommending that Defendants' motion to dismiss be denied, which was adopted by Judge Scullin, this case has sufficient contacts with New York to enforce the choice-of-forum provision.  (Dkt. Nos. 30, 31.)  In addition, Plaintiff's offices were in New York; all the services it provided to Defendants were in New York; and all of the

---

[15]     (*Id*.)

[16]     (Dkt. No. 77, Attach. 25, at 12-13.)

[17]     (Dkt. No. 77, at ¶ 57 [acknowledging that the amount of the default was not paid]; Dkt. No. 77, Attach. 23, at 3-6.)

wrongful acts alleged by Defendants in their counterclaims are alleged to have taken place in New York.  For these reasons, the Court concludes that New York law governs the Franchise Agreement.

Under New York law, a stipulated damages clause is enforceable provided that "[1] the clause . . . specif[ies] a liquidated amount which is reasonable in light of the anticipated probable harm, and [2] actual damages [are] difficult to ascertain as of the time the parties entered into the contract."  *Wilmington Trust Co. v. Aerovias de Mexico, S.A. de C.V.*, 893 F. Supp. 215, 218 (S.D.N.Y. 1995).  "It is well established that whether a clause 'represents an enforceable liquidation of damages or an unenforceable penalty is a question of law, giving due consideration to the nature of the contract and the circumstances.'"  *Jackson Heights Care Ctr., LLC v. Bloch*, 39 A.D.3d 477, 479 (N.Y. App. Div., 2d Dept 2007) (citing *JMD Holding Corp. v. Congress Fin. Corp.*, 4 N.Y.3d 373, 379 [N.Y. 2005]).

"A party requesting that a court strike down a liquidated damages provision as an unenforceable penalty must demonstrate that [1] the damages are not a reasonable measure of the actual loss resulting from the breach, and [2] the actual loss is readily ascertainable."  *Zeer v. Azulay*, 50 A.D.3d 781, 785 (N.Y. App. Div., 2d Dept 2008).  "When analyzing the reasonableness of a liquidated amount, a court must . . . give due consideration to the nature of the contract and the attendant circumstances."  *Wilmington Trust Co.*, 893 F. Supp. at 218. "Relevant to this inquiry is the sophistication of the parties and whether both sides were represented by able counsel who negotiated the contract at arms length without the ability to overreach the other side."  *Id*.

In deciding whether a defendant has satisfied this burden, it is also important to keep two points in mind.  First, "freedom of contract through the enforcement of stipulated damage

provisions [is preferred,] as long as . . . the principle of compensation [is not clearly disregarded]."  *JMD Holding*, 4 N.Y.3d at 381.  Second, "courts should resolve any reasonable doubt as to whether a provision constitutes an unenforceable penalty or a proper liquidated damages clause in favor of a construction which holds the provision to be a penalty."  *Howard Johnson Int'l Inc. v. HBS Family, Inc.*, 96-CV-7687, 1998 WL 411334, at *5 (S.D.N.Y. July 22, 1998) (Sotomayor, J.)

Here, as an initial matter, the Court finds that the second element of the New York test for evaluating the enforceability of a liquidated damages provision(i.e., the requirement that actual damages are difficult to ascertain as of the time the parties entered into the contract) is satisfied because actual damages were not readily ascertainable at the time the parties entered into the Franchise Agreement.  However, turning to the test's first element (i.e., the requirement that the clause specifies a liquidated amount that is reasonable in light of the anticipated probable harm), after taking all the relevant factors into account, the Court finds that the stipulated damages provision operates as a penalty, and is therefore unenforceable.  The Court reaches this conclusion for a variety of reasons.

First, the dollar amount that Plaintiff seeks to recover as stipulated damages, i.e., $54,975.00, does not appear to bear a reasonable relationship to the pecuniary harm that Plaintiff most likely suffered as a result of Defendants' breach.  For example, it is undisputed that at least one of the customers with whom Defendants worked as a franchisee was a national client (i.e., a client serviced by other of Plaintiff's franchisees).  (Dkt. No. 78 at ¶ 70 [stating that Amptek was a national client and citing record evidence in support of the statement].)[18]  In addition,

---

[18]      The Court notes that Plaintiff failed to issue a response to Defendants' Counter-Statement of Material Facts.  As a result, those statements properly supported by record evidence and not couched as legal conclusions are deemed admitted.  *See* N.D.N.Y. L.R. 7.1(a)(3) (noting

according to Plaintiff's own allegations, the harm flowing from Defendants' having billed (and received payment for) services they failed to render is merely Plaintiff's having to perform services (which Plaintiff appears entirely able to perform) worth approximately $2,665.00 without being paid. (Dkt. No. 70, Attach. 4, at ¶ 9(b) [stating that Defendants are responsible for $2,665.00 in prepayments, made by Rescuecom's customers to Defendants for future services, which Defendants never rendered, the responsibility for which fell upon Rescuecom after termination].) These facts establish that Plaintiff was, and is, able to service at least some of the same clients that Defendants previously serviced, in the aftermath of Defendants' termination.[19] In other words, it does not appear that Plaintiff will be out-of-pocket anything close to the requested stipulated damages amount.

Second, the parties appear to have possessed unequal bargaining power at the time the Franchise Agreement was executed. For example, Defendant Chumley was not represented by counsel, and the Franchise Agreement was non-negotiable. (Dkt. No. 70, Attach. 19, at 43-44.) Moreover, Defendant Chumley, while an educated individual with some industry experience,

---

that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert").

[19]     The Court notes also that Plaintiff was made aware, prior to terminating Defendants' franchise, that Defendants were owed approximately $11,000 from Amptek for services rendered. (Dkt. No. 70, Attach. 20, at 4-5, 11-12 [testifying that Amptek owed Defendants "eleven grand," of which Milman was made aware].) While the record establishes that Defendants were never paid this money, it appears that, in calculating its stipulated damages, Plaintiff factored in royalty fees owed on this $11,000 amount. (Dkt. No. 70, Attach. 15, at 4 [reflecting product sales for the month of May 2006 as $10,695.60]; Dkt. No. 70, Attach. 20, at 5 [testifying that Amptek was Defendants' first customer, the services for Amptek were performed in April, and he did not pick up other customers until late-May or early June].) To the extent the calculated stipulated damages of $54,975.00 factor in royalties paid on this $11,000, the requested amount is also excessive.

was not a sophisticated business person.[20]  Finally, apparently because of the parties' unequal

bargaining power, the stipulated damages provision was not symmetrical.  (Dkt. No. 70, Attach.

6, at 18-19.)

For all of these reasons, the Court finds that the stipulated damages provision at issue in

this case constitutes an unenforceable penalty, because it is unconscionable as defined under

New York law.  *See Howard Johnson Int'l Inc.*, 1998 WL 411334, at *7-8 (finding liquidated

damages provision to constitute unenforceable penalty where (1) it did not "bear[ ] any

reasonable relationship to the pecuniary harm plaintiff would have likely suffered in the event of

a breach[,]" (2) "the parties were clearly unequal in bargaining power[,]" (3) Defendant "was not

represented by an attorney when [it] entered the License Agreement[,]" and (4) the provision was

not symmetrical).

The Court would add only that, while Plaintiff is entitled to recover actual damages

suffered as a result of the termination of the franchise relationship, it must show that it has

mitigated its damages.  *See Howard Johnson Int'l Inc.*, 1998 WL 411334, at *8 (collecting

cases).  In addition, "actual damages for the entire length of the [Franchise] Agreement may be

unreasonable."  *Id.* (citing *Ramada Franchise Sys., Inc. v. Motor Inn Inv. Corp.*, 755 F. Supp.

1570, 1578-79 [S.D. Ga. 1991] [stating that the resulting harm from premature termination of a

license agreement would be the profits lost while the franchisor was without a franchisee and

that "[t]here is no dispute . . . that two years is the average time it takes to find a replacement"]).

For these reasons, Plaintiff's motion for summary judgment on its breach-of-contract

---

[20]        During his deposition, Defendant Chumley testified that he has a bachelor's
degree in "general studies" from Louisiana State University, and that, prior to purchasing a
Rescuecom franchise, he worked for approximately ten years as an "information systems
specialist."  (Dkt. No. 70, Attach. 19, at 6-7.)

claim against Defendants with respect to liability for actual damages is granted;[21] but Plaintiff's motion for summary judgment on its breach-of-contract claim with respect to liability for stipulated damages in the amount of $54,975.08 is denied.[22]

### B.   Attorney's Fees

Defendants also argue that the stipulated attorney's fee award of 25% of the damage award is unreasonable.  The Court cannot help but begin its analysis of this issue by noting that, when Plaintiff moved for this case to be remanded to state court, Defendants successfully argued in favor of the attorneys-fee provision of 25% being included as part of the damages sought (in support of its argument that the amount in controversy exceeded the $75,000 minimum for a case where jurisdiction was founded upon diversity of citizenship).  (Dkt. No. 10.)  In any event, regardless of Defendants' prior position on this issue, the Court finds that an award of 25% of the judgment is not unreasonable under these circumstances.  *See U.S. v. Romelien*, 05-CV-1341, 2006 WL 721312, at *2 (E.D.N.Y. Mar. 16, 2006) (noting that, "in lieu of calculating attorneys' fees with the lodestar method, the court may award a percentage of the amount recovered," and finding that an award of 20% of the total amount recovered was reasonable under the circumstances).  Finally, "it is well settled that attorney's fees may be awarded for in-house

---

[21]     The Court notes that Plaintiff has adduced admissible record evidence establishing actual damages of $5,393.84 plus $2,665.00 for "payments [that Defendant Chumley has taken] from [Plaintiff's] customers for prepaid services," for a total of $8,058.84. However, Plaintiff's motion does not request an actual damages amount, and therefore the parties have not briefed the Court on this issue.  As a result, the Court declines to decide this issue at this time.

[22]     The Court notes that Defendants' argument that they are entitled to additional discovery before this issue may be decided is without merit.  Defendants have failed to adduce admissible record evidence establishing that Plaintiff has prevented them from discovering any materials or deposing any witnesses.  In addition, the only record evidence on the issue establishes that Plaintiff made efforts to assist Defendants in discovery, but that Defendants were unwilling to assume the related expenses.  (Dkt. No. 83, Attach. 7.)

attorneys." *Holmes v. NBC/GE*, 168 F.R.D. 481, 482 n.3 (S.D.N.Y. 1996); *Video-Cinema Films, Inc. v. Cable News Network, Inc*., 98-CV-7128, 2004 WL 213032, at *6 (S.D.N.Y. Feb. 3, 2004). For these reasons, the Court rejects Defendants' argument that the stipulated attorney's fee award of 25% of the damage award is unreasonable.

#### C.    Defendants' Counterclaims

As stated above in Part I.E. of this Decision and Order, Plaintiff seeks the dismissal of Defendants' counterclaims because (1) Defendants have failed to adduce admissible record evidence establishing that they suffered damages as a result of Plaintiff's alleged fraud and/or misrepresentations, and (2) Defendants have failed to adduce admissible record evidence establishing the necessary elements of any of their counterclaims.  More specifically, Plaintiff argues as follows: (1) Defendants' fraud-related claims must be dismissed because Defendants have failed to adduce admissible record evidence establishing that (a) Plaintiff made any false statements, (b) Plaintiff acted with fraudulent intent, or (c) as a result of their reliance on the alleged fraudulent statements, they suffered damages; (2) Defendants' claims of unjust enrichment and quantum meruit must be dismissed because (a) Defendants have failed to adduce admissible record evidence establishing breach of a promise or damages, and (b) these claims are precluded by the existence of an express contract; (3) Defendants' claim of rescission must be dismissed because (a) Defendants cannot rescind a contract that was already terminated due to default, and (b) Defendants have failed to adduce admissible record evidence establishing their fraud-related claims; (4) Defendants' conversion claim must be dismissed because Defendants admitted that Plaintiff did not take any of their property without authorization; (5) Defendants' claim for breach of fiduciary duty must be dismissed because (a) Defendants admitted that their allegations in support of this claim were false, and (b) Defendants have failed to adduce

admissible record evidence establishing that the parties had a fiduciary or confidential relationship; and (6) Defendants' claim that Plaintiff violated a Louisiana statute that prohibits agreements restricting trade must be dismissed because a separate Louisiana state statute permits non-competition covenants in franchise agreements.

### 1.    Fraud-Related Counterclaims

Based on the current record, the Court accepts Plaintiff's first argument (i.e., its argument that Defendants have failed to adduce admissible record evidence establishing that they suffered damages as a result of Plaintiff's alleged fraud and/or misrepresentations) with respect to Defendants' First, Second, Third, and Fourth Counterclaims.

As an initial matter, Defendants failed to address this argument in their response memorandum of law.  (*See generally* Dkt. No. 79.)  As a result, Plaintiff's burden with regard to this argument is lightened such that, in order to succeed, it need only show its entitlement to the relief requested in its motion, which has appropriately been characterized as a "modest" burden. *Dottolo v. Byrne Dairy, Inc.*, 08-CV-0390, 2010 WL 2560551, at *7 (N.D.N.Y. June 22, 2010) (Suddaby, J.) (collecting cases).  For the reasons stated by Plaintiff in its motion papers, the Court finds that Plaintiff has met this lightened burden.

In any event, the Court finds that Plaintiff's argument would survive even the heightened scrutiny appropriate on a contested motion.  Under New York law, injury is an essential element of a fraud and/or intentional misrepresentation claim.  *See Newcourt Small Bus. Lending Corp. v. Grillers Casual Dining Group, Inc.*, 284 A.D.2d 681, 683 (N.Y. App. Div. 3 Dept. 2001); *New York City Transit Auth. v. Morris J. Eisen, P.C.*, 276 A.D.2d 78, 85 (N.Y. App. Div., 1st Dept. 2000); *Philips Credit Corp. v. Regent Health Group, Inc.*, 953 F. Supp. 482, 520 (S.D.N.Y. 1997); *Flora v. Kingsbridge Homes, a Div. of Kingsbridge Enter. Inc.*, 214 A.D.2d 834, 836

(N.Y. App. Div. 3 Dept. 1995). At best, Defendants have adduced record evidence establishing that (1) they were not paid by Amptek for services rendered, (2) they were not immediately paid by Plaintiff for credit card transactions made by Defendants' clients for services rendered, and (3) they suffered numerous fees for insufficient funds as a result of Plaintiff's repeated attempts to withdraw money from Defendants' business account, which did not contain money.[23]

However, with regard to payments withheld by Amptek, while Defendant Chumley testified during his deposition that Plaintiff's representatives knew that Amptek would not pay Defendants for services rendered prior to Defendants rendering the services,[24] he also testified that (1) he volunteered to service Amptek (Dkt. No. 70, Attach. 20, at 7), and (2) neither Plaintiff, nor any of its representatives, guaranteed that Defendants would be paid be Amptek (Dkt. No. 70, Attach. 19 at 15). Moreover, Plaintiff has adduced admissible record evidence establishing that it credited Defendants $2,494.26 and $216.76 for royalties and fees Defendants paid Plaintiff for services rendered to Amptek because that customer never paid Defendants for their services. (Dkt. No. 70, Attach. 15, at 1.) In other words, while it appears that Defendants have suffered damages as a result of not being paid by Amptek for services rendered, Defendants

_____

[23]   Although Defendants argue that they were fraudulently induced into purchasing their franchise, they have failed to adduce admissible record evidence establishing that, as a result of Plaintiff's representative's alleged false statements, they were injured. To the contrary, the record establishes that Defendants made money as franchisees (*see* Dkt. No. 70, Attach. 15, at 4 [demonstrating that Defendants earned $38,293.93 in a six-month period before the payment of royalty fees, and $31,696.92 after paying Plaintiff royalty fees]), a fact not altered by whether Defendants received payments for "eleven grand" of this money. In addition, although Defendants appear to argue that Plaintiff misrepresented the quality and capability of the SystemOne software and services, Defendant Chumley testified during his deposition that he was unaware of any damages, lost customers, or lost business that he experienced as a result of problems he experienced with the software and services. (Dkt. No. 70, Attach. 19, at 20-21, 35, 38.)

[24]   (Dkt. No. 70, Attach. 20, at 9-16.)

have failed to adduce admissible record evidence establishing that they suffered damages as a result of Plaintiff's alleged fraud and/or misrepresentations concerning this customer.

In addition, with regard to credit card payments withheld by Plaintiff, Defendant Chumley testified during his deposition that Plaintiff owes him approximately $1,400, minus the 26% in royalty fees to which Plaintiff was "rightfully entitled."  (Dkt. No. 70, Attach. 20, at 35-36.)  However, Plaintiff has adduced admissible record evidence establishing that, in determining actual damages owed by Defendants, Plaintiff credited Defendants $1,053.43, which is more than 74% of $1,400.  (Dkt. No. 70, Attach. 15, at 1.)[25]

Finally, with regard to the fees for insufficient funds suffered by Defendants as a result of Plaintiff's attempted withdrawals, Defendants have failed to adduce admissible record evidence establishing that Plaintiff was not entitled to the fees that it sought to collect (which could not be collected due to insufficient funds in Defendants' business account).  In other words, Defendants have failed to adduce admissible record evidence establishing that they suffered any injuries as a result of Plaintiff's false or recklessly made statements or representations.  *See Jo Ann Homes at Bellmore v. Dworetz*, 25 N.Y.2d 112, 119 (N.Y. 1969) (noting that the elements of a fraud claim are "a representation of fact, which [wa]s either untrue and known to be untrue or recklessly made, and which [wa]s offered to deceive [them] and to induce them to act upon it, causing injury").[26]

As a result, Defendants' First, Second, Third, and Fourth Counterclaims are dismissed for

---

[25]     $1,400 multiplied by 0.26 equals $364, and $1,400 minus $364 equals $1,036.

[26]     Based on Defendants' failure to establish an actual injury as a result of Plaintiff's false or recklessly made statements or representations, the Court need not, and does not, consider Plaintiff's alternative argument for dismissing Defendants' fraud-based counterclaims (i.e., that Defendants failed to adduce admissible record evidence establishing that Plaintiff, or any of its representatives, made false statements to Defendants or acted with fraudulent intent).

the reasons asserted by Plaintiff in its first argument (i.e., its argument that Defendants have failed to adduce admissible record evidence establishing that they suffered damages as a result of Plaintiff's alleged fraud and/or misrepresentations).

Furthermore, based on the current record, the Court accepts Plaintiff's second argument (i.e., its argument that Defendants have failed to adduce admissible record evidence establishing the necessary elements of their counterclaims) with respect to Defendants' Fifth, Sixth and Seventh Counterclaims.

### 2. Counterclaims for Negligent Misrepresentation and Breach of Fiduciary Duty

Defendants assert counterclaims of negligent misrepresentation and breach of fiduciary duty based on Plaintiff allegedly engaging in a pattern of conduct, which was intended to and did misrepresent the facts of the franchise opportunities, thereby fraudulently inducing Defendants to enter into the Franchise Agreement and expend money, time and labor in the franchise and business that was developed based on it.

Under New York law, in order to succeed on a claim of negligent misrepresentation or breach of fiduciary duty, the claimant must establish, among other things, the existence of a fiduciary or confidential relationship.[27]  Here, Defendants argue that the parties had a special

---

[27]     *See Ebusinessware, Inc. v. Tech. Serv. Group Wealth Mgmt. Solutions, LLC*, 08-CV-9101, 2009 WL 5179535, at *12 (S.D.N.Y. Dec. 29, 2009) (noting that "the existence of a fiduciary or confidential relationship is an element of negligent misrepresentation under New York law"); *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d Cir. 2000) ("The elements of a negligent misrepresentation claim under New York law include showing that . . . the defendant had a duty, as a result of a special relationship, to give correct information . . . ."); *SCS Commc'n, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 342 (2d Cir. 2004) (noting the elements of a breach of fiduciary duty claim to include a duty owed by one party to another based on a special relationship); *Horn v. 440 E. 57th Co.*, 547 N.Y.S.2d 1, 5 (N.Y. App. Div. 1st Dept 1989) ("Fairly construed, [causes of action for negligent misrepresentation and breach of fiduciary duty] omit the element of a deceitful intent on defendant's part and substitute therefore the existence of a fiduciary relationship of trust and confidence.").

relationship because they did not have equal bargaining power when the Franchise Agreement was negotiated, and Plaintiff had access to Defendants' business accounts.  Neither argument is persuasive.  Under the circumstances, no fiduciary or confidential relationship was created.[28]

As a result, Defendants' claims of negligent misrepresentation and breach of fiduciary duty are dismissed.

### 3.    Counterclaim for Quantum Meruit

Defendants assert a counterclaim for quantum meruit based on Plaintiff allegedly engaging in a pattern of conduct, which was intended to and did misrepresent the facts of the franchise opportunities, thereby fraudulently inducing Defendants to enter into the Franchise Agreement and expend money, time and labor in the franchise and business that was developed based on it.

"Under New York law the precise definition of quantum meruit requires a showing of [1] the performance of services in good faith[,] [2] acceptance of services by the person to whom they were rendered[,] [3] the expectation of compensation for those services[,] and [4] reasonable value of the services."  *Clarke v. Max Advisors, LLC*, 235 F. Supp.2d 130, 148 (N.D.N.Y. 2002) (Peebles, M.J.) (citing *Freedman v. Pearlman*, 271 A.D.2d 301, 304 [N.Y.

---

[28]      *See Ironforge.com v. Paychex, Inc*., 09-CV-6264, 2010 WL 3911419, at *8 (W.D.N.Y. Oct. 5, 2010) ("Plaintiffs' argument that Paychex had a fiduciary duty by virtue of its access to plaintiffs' bank accounts is not persuasive. That Paychex may have been in a position to withdraw funds from plaintiffs' accounts does not make it a fiduciary. Although plaintiffs contend that this demonstrates that Paychex occupied a position of trust vis-a-vis the plaintiffs, virtually all ongoing contractual relationships involve some degree of mutual trust, particularly where one party to the contract has temporary custody of the other party's assets or property. That does not automatically give rise to a fiduciary relationship, however."); *AJW Partners LLC v. Itronics Inc*., 68 A.D.3d 567, 568 (N.Y. App. Div., 1st Dept 2009) (dismissing negligent misrepresentation and breach of fiduciary duty counterclaims because "there can be no fiduciary obligation in a contractual arm's length relationship between a debtor and note-holding creditor"); *Solondz v. Barash*, 225 A.D.2d 996, 998 (N.Y. App. Div., 3d Dept 1996) (noting that "[a] 'special relationship' requires a closer degree of trust than an ordinary business relationship").

App. Div. 1st Dept. 2000]).

"It is well established . . . that the existence of express written agreements under some circumstances can preclude recovery under quantum meruit . . . ."  *Clarke*, 235 F. Supp.2d at 149 (citing, *inter alia*, *Theatre Row Phase II Assocs. v. Nat'l Recording Studios, Inc.*, 291 A.D.2d 172, 175 [N.Y. App. Div. 1st Dept. 2002]).  "To preclude an equitable quasi contract claim, however, the underlying express contract must be a valid contract; in other words, a plaintiff is not precluded from asserting a claim in quantum meruit . . . if it is alleged that the underlying contract is invalidated by fraud or otherwise unenforceable."  *Id*.

Here, Defendants have failed to adduce admissible record evidence establishing that the Franchise Agreement is not valid.  As a result, Defendants' counterclaim for quantum meruit is dismissed.

### 4.      Counterclaim for Breach of Contract

Defendants assert a counterclaim for breach of contract based on (1) Plaintiff allegedly failing to pay Defendants for certain monies collected from customers, (2) David Milman, Plaintiff's CEO, backdating his signature on the Franchise Agreement, and (3) Plaintiff allegedly engaging in a pattern of conduct, which was intended to and did misrepresent the facts of the franchise opportunities, thereby fraudulently inducing Defendants to enter into the Franchise Agreement and expend money, time and labor in the franchise and business that was developed based on it.

With regard to Defendants' claim that Plaintiff failed to pay them for certain monies collected from customers, Defendants have failed to adduce admissible record evidence establishing that Plaintiff received money from Defendants' customers that was not credited back to Defendants.  In fact, the record establishes that Plaintiff received money from Defendants' customers in the form of credit card payment (which were authorized by

Defendants), which it in turned credited to Defendants' account.  (Dkt. No. 70, Attach. 15, at 1.)
As a result, Defendants' breach-of-contract claim based on Plaintiff's alleged failure to pay them
for certain monies collected from customers is dismissed.

With regard to Defendants' claim that Plaintiff breached the Franchise Agreement when
its CEO backdated his signature, Defendants have failed to adduce admissible record evidence
establishing that the terms of the Franchise Agreement changed between the date it was signed
by Plaintiff's CEO (i.e., January 25, 2006),[29] and the date on which Plaintiff's CEO allegedly
backdated his signature to January 25, 2006 (i.e., March 30, 2006).[30]  Simply put, there is no
dispute that the parties acted in accordance with the terms of the Franchise Agreement leading
up to the day on which the Franchise Agreement was signed by David Milman such that
backdating the signature does not invalidate the force and effect of the Franchise Agreement.
*Niss v. Columbia Pictures Indus., Inc*., 97-CV-4636, 2000 WL 1862814, at *1 n.2 (S.D.N.Y.
Dec. 20, 2000) ("Plaintiff asserts that the contracts were backdated and do not reflect the actual
date of execution. . . . Defendants do not contest plaintiff's assertions . . . . Plaintiff, however,
does not make any claim that the contracts are invalid or void for any reason. In any event, the
precise dates of the contracts do not change their legal significance . . . .").  In addition,
Defendants have failed to adduce admissible record evidence establishing that, as a result of
David Milman backdating his signature, they suffered damages.  For these reasons, Defendants'
breach-of-contract claim based on Plaintiff's CEO allegedly backdating his signature on the
Franchise Agreement is dismissed.

Finally, with regard to Defendants' claim that Plaintiff induced them to enter into the

---

[29]     (Dkt. No. 70, Attach. 7, at 12.)

[30]     (Dkt. No. 70, Attach. 20, at 1.)

Franchise Agreement, this claim is dismissed for three reasons.  First, it is duplicative of

Defendants' fraudulent inducement claim, which the Court has already dismissed.  *See*

*Parmasteelisa, S.p.A. v. Lincolnshire Mgmt., Inc.*, 16 A.D.3d 352, 352 (N.Y. App. Div. 1st Dept

2005).  Second, Defendants have failed to adduce admissible record evidence establishing that,

after the Franchise Agreement was executed, Plaintiff, through any of its representatives,

violated any provisions of the Franchise Agreement, or took affirmative steps to frustrate the

purpose of the Franchise Agreement.  Third, Defendants have failed to adduce admissible record

evidence establishing that, as a result of Plaintiff's breach of the Franchise Agreement, they

suffered damages.

As a result, Defendants' breach-of-contract claim based on Plaintiff allegedly inducing

them to enter into the Franchise Agreement is dismissed.

### 5.    Counterclaim for Conversion

Defendants assert a counterclaim for conversion based on Plaintiff (1) billing Amptek for

work not actually done, collecting royalties on this work, and then collecting royalties from

Defendants for services they preformed for Amptek, but for which they were not paid, and (2)

failing to remit monies from credit card payments made by Defendants' customers for services

rendered by Defendants.

Under New York law, "[a] conversion takes place when someone, intentionally and

without authority, assumes or exercises control over personal property belonging to someone

else, interfering with that person's right of possession."  *Colavito v. New York Organ Donor*

*Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006).

With regard to Defendants' claim that Plaintiff collected royalties for work not actually

done, Defendants have failed to adduce admissible record evidence establishing that Plaintiff

*intentionally* took royalties from Defendants for work that Defendants performed, but for which

Defendants were not paid.  In fact, as previously mentioned, the record evidence establishes that

Plaintiff credited Defendants $2,494.26 for "Amptek Royalties Charged," and $216.76 for

"Amptek Advertising 2% Charged."  (Dkt. No. 70, Attach. 15, at 1.)

　　　　With regard to Defendants' claim that Plaintiff failed to remit monies from credit card

payments made by Defendants' customers for services rendered by Defendants, for the reasons

stated in Part III.B.3. of this Decision and Order, the Court rejects this claim.

　　　　As a result, Defendants' counterclaim for conversion is dismissed.

### 6.　　Counterclaims for Unjust Enrichment and Quantum Meruit

　　　　Defendants assert counterclaims for unjust enrichment and quantum meruit based on

Plaintiff allegedly taking money from clients whom Defendants serviced, and not paying

Defendants.

　　　　For a recitation of the elements governing a claim for quantum meruit, the Court refers

the reader to Part III.B.2. of this Decision and Order.  "To show unjust enrichment, [Defendants]

must show that they conferred a benefit upon [Plaintiff] without adequate compensation."

*Clarke*, 235 F. Supp.2d at 149.  "Unjust enrichment is defined under New York law to include

retention of a benefit conferred by another, without compensation, under circumstances where

compensation would reasonably be expected or, put another way, as a benefit received and not

intended as a gift for which restitution or compensation should be made."  *Id*.  "It is well

established . . . that the existence of express written agreements under some circumstances can

preclude recovery under quantum meruit, unjust enrichment, and quasi contract theories."  *Id*.

　　　　Here, as stated in Part III.B.3. of this Decision and Order, Defendants have failed to

adduce admissible record evidence establishing that Plaintiff received money from Defendants'

customers, which was not credited back to Defendants.  In fact, the record establishes that

Plaintiff received money from Defendants' customers in the form of credit card payment (which were authorized by Defendants), which it in turned credited to Defendants' account.  (Dkt. No. 70, Attach. 15, at 1.)

As a result, Defendants claims for unjust enrichment and quantum meruit are dismissed.

### 7.   Counterclaim for Violation of N.Y. Gen. Bus. Law § 687

Defendants assert a counterclaim for violation of N.Y. Gen. Bus. Law § 687 based on Plaintiff's alleged false statements and material misrepresentations in its Franchise Agreements and other documents and communications regarding the management and operation of the Rescuecom Franchise.

Section 687 of the New York General Business Law, entitled "Fraudulent and Unlawful Practices," states that, in connection with the offer, sale or purchase of any franchise, it is unlawful for any person to "make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  N.Y. Gen. Bus. Law § 687(2)(b) (McKinney's Gen. Bus. Law § 687).

At best, Defendants have adduced admissible record evidence establishing that certain services that Plaintiff offered to provide to its franchisees, such as the Handheld services, did not work in the manner represented.  For example, during his deposition, Defendant Chumley testified that (1) franchisees do not receive calls made to the Rescuecom call center in real time, (2) the battery on the hand held device was weak, such that it constantly needed to be recharged, which resulted in missed calls, and (3) these issues reduced his overall uptime to between 75% and 80%.  (Dkt. No. 70, Attach. 19, at 18-20.)  However, Defendant Chumley also testified that he was not aware of service calls or business that he lost as a result of these issues.  (*Id.* at 21.)

Moreover, the record evidence establishes that, between May 2006 and August 2006, Defendants' franchise was profitable.  (Dkt. No. 70, Attach. 15, at 1, 4.)  In other words, even assuming that Plaintiff's representatives made certain statements about Rescuecom's services that were misleading, Defendants have failed to adduce admissible record evidence establishing that the untrue or misleading statements were of *material* fact.  *See Dunkin' Donuts, Inc. v. HWT Assoc., Inc.*, 181 A.D.2d 711, 713 (N.Y. App. Div. 2 Dept. 1992) ("Without damages there can be no action for fraud . . ., and a misrepresentation on a matter that is shown to have had a negligible effect on the defendants' business cannot be said to be material and thus cannot support an action for rescission, either in equity or under General Business Law § 687(2).").

As a result, Defendants' counterclaim for violation of N.Y. Gen. Gus. Law § 687 is dismissed.

### 8.     Counterclaim for Violation of Louisiana Statute 51:122

Defendants assert a counterclaim for violation of Louisiana Statute 51:22 based on the alleged unreasonable restrictions in the non-compete clause in the Franchise Agreement.  In response, Plaintiff argues that (1) there is a specific Louisiana State Statute that permits restrictive covenants against competition in franchise agreements, and (2) this counterclaim is moot because it is not pursuing "enforcement of the restrictive covenants."  (Dkt. No. 70, Attach. 2, at 23-24.)  Plaintiff concedes that pursuing its claim for declaratory relief regarding the enforceability of the restrictive covenant would be futile because "[it] is not in possession of any evidence that Defendants have breached th[e non-compete] provision, and Defendant [Chumley] . . . swor[e] during his deposition that he has not competed, but is employed in a non-computer related job."  (*Id*. at 24.)

37

Based on the fact that Plaintiff has withdrawn its request for enforcement of the restrictive covenant, Defendants' counterclaim for violation of Louisiana Statute 51:22 is dismissed.

### D.   Defendants' Motion to Strike Plaintiff's Reply

Defendants argue that the Court should strike Plaintiff's reply and/or permit Defendants to depose Plaintiff's counsel before considering the reply affirmation because, in the reply, Plaintiff's counsel offers testimony based on personal knowledge.  (Dkt. No. 91.)  While the Court acknowledges that portions of the reply affirmation impermissibly contain testimonial statements,[31] the Court need not, and does not, consider any of these testimonial statements in deciding the pending motions.  As a result, the Court denies Defendants' motion to strike Plaintiff's reply as moot.

### E.   Plaintiff's Motion for Default Judgment and Defendant Chumley's Motion to Set Aside the Entry of Default Against Him

On October 28, 2010, Plaintiff submitted a letter-motion arguing that the Court should grant its requested relief based on Defendants' violation of Magistrate Judge Lowe's Decision and Order directing that (1) counsel for Defendant OSI file a notice of appearance by October

---

[31]      *See* Ethical Rule 3.7(a) ("A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless: (1) the testimony relates solely to an uncontested issue; (2) the testimony relates solely to the nature and value of legal services rendered in the matter; (3) disqualification of the lawyer would work substantial hardship on the client; (4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or (5) the testimony is authorized by the tribunal."); N.D.N.Y. L.R. 7.1(a)(2) ("An affidavit must not contain legal arguments but must contain factual and procedural background that is relevant to the motion the affidavit supports."); *Duttweiler v. Eagle Janitorial, Inc.*, 05-CV-0886, 2009 WL 5171834, at *3 (N.D.N.Y. Dec. 22, 2009) (Suddaby, J.) (striking affidavit of counsel because, *inter alia*, it contained legal argument); *cf.* N.D.N.Y. L.R. 7.1(a)(3) ("The record [on a summary judgment motion] . . . does not . . . include attorney's affidavits.").

10, 2010, and (2) counsel for Defendant Chumley file a notice of appearance, or Defendant

Chumley provide the Court and counsel with contact information, including, at a minimum, a

telephone number and address.  (Dkt. No. 120.)

On November 1, 2010, this Court issued a Decision and Order directing the Clerk to file

an Entry of Default against Defendants on the docket.  (Dkt. No. 121.)  In that Decision and

Order, the Court ordered Defendants to show cause, by November 15, 2010, why default

judgment should not be entered against them and why their counterclaims should not be

dismissed for failure to prosecute/comply with orders of the Court.  (*Id*.)  The Court reserved

decision on Plaintiff's motion for entry of default judgment pending the expiration of the order to

show cause deadline of November 15, 2010.  (*Id*.)

On November 15, 2010, Defendant Chumley issued a letter-motion on behalf of himself

and Defendant OSI, in which he apologized to the Court for his failure to comply with

Magistrate Judge Lowe's Orders and requested an extension of time to retain new counsel.  (Dkt.

No. 123.)  On that same day, the Court issued a Text Order granting Defendants an extension of

time to retain new counsel.  (Text Order filed on November 15, 2010.)

On December 14, 2010, Defendant Chumley submitted a second letter-motion requesting

an extension of time to retain new counsel.  (Dkt. No. 124.)  On December 16, 2010, the Court

issued a Text Order granting Defendant Chumley an extension of time to retain new counsel

until January 6, 2011.  (Text Order filed on December 16, 2010.)

On January 6, 2011, Defendant Chumley submitted two documents, in which he (1)

advised the Court that he was unable to locate counsel to represent Defendant OSI, (2) requested

that Defendant OSI be removed from this action because it is a revoked corporation, which is

inactive and has no assets, (3) advised the Court that he intends to proceed *pro se*, and (4)

requested that Plaintiff's motion for default judgment against Defendant Chumley be denied. (Dkt. Nos. 126-127.)[32]  Based on Defendant Chumley's status as a *pro se* litigant, the Court liberally construes these two documents as (1) an opposition to Plaintiff's motion for default judgment against both Defendants, and (2) a letter-motion to (a) permit Defendant Chumley to represent himself *pro se*, and (b) set aside the Clerk's Entry of Default against him.

### 1.    Clerk's Entry of Default Against Defendant Chumley

"Generally, the standard for setting aside the entry of a default pursuant to [Fed. R. Civ. P.] 55(c) is less rigorous than the 'excusable neglect' standard for setting aside a default judgment by motion pursuant to [Fed. R. Civ. P.] 60(b)."  *Gates v. Wilkinson*, 03-CV-0763, 2005 WL 3115826, at *1 (N.D.N.Y. Nov. 21, 2005) (Sharpe, J.) (citing *Meehan v. Snow*, 652 F.2d 274, 276 [2d Cir. 1981]).  "Courts in this Circuit have construed 'good cause' in this context broadly."  *Brady v. W. Overseas Corp.*, 04-CV-2878, 2008 WL 4936875, at *4 (E.D.N.Y. Nov. 14, 2008) (citing *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 [2d Cir. 1993]).  "In deciding whether good cause exists, the court examines [the following] three factors: (1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented."  *Brady*, 2008 WL 4936875, at *4.  "In applying this analysis, the court must bear in mind the well-established preference for resolving litigation disputes on the merits."  *Id*.  "Any doubts as to whether a default should be vacated must be resolved in favor of trial on the merits."  *Id*.

Turning to the first factor, willfulness, the Court finds that, although Defendant Chumley's behavior in failing to file a notice of appearance pursuant to Magistrate Judge Lowe's Order–the reason for his ultimate default–was certainly negligent, there is no evidence of bad

---

[32]    That same day, Defendant Chumley filed a notice of appearance. (Dkt. No. 128.)

faith, "a factor that the Second Circuit looks to in the willfulness analysis under the stricter Rule 60 standard[,]" which the Court must therefore consider in undergoing an analysis under Fed. R. Civ. P. 55. *Brady*, 2008 WL 4936875, at *4 (citing *Am. Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 60-62 [2d Cir. 1996]). Instead, as in *Brady*, an "[e]xamination of the docket supports a finding that . . . [D]efendant [Chumley] did not deliberately ignore the orders of the court, but was negligently unaware of them." (Dkt. No. 123.) Indeed, to conclude otherwise would be problematic in light of the fact that Defendants had actively participated in the litigation process for approximately three years prior to their failure to comply with Magistrate Judge Lowe's Order.

With regard to the second factor, the Court finds that Plaintiff has not been prejudiced as a result of Defendants' failure to file notices of appearances because, during Defendants' delay, a motion for summary judgment was pending before the Court. In other words, even if Defendants had timely appeared, this action would be at the same stage in which it is currently, i.e., awaiting a decision on the pending motion for summary judgment.

Finally, with regard to the third factor, for the reasons stated above in Part III.A. of this Decision and Order, the Court finds that Defendants have presented a meritorious defense with regard to the issue of the enforceability of the stipulated damages provision.

For these reasons, the Court grants Defendant Chumley's motion to set aside the entry of default against him, and denies Plaintiff's motion for default judgment against him. The Court notes that it grants Defendant Chumley's request to proceed *pro se* in this civil action, because (as an individual making the request before trial) he possesses a statutory right to do so under the circumstances. 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein.").

###### 2.        Motion for Default Judgment Against Defendant OSI

In his letter-response of January 6, 2011, Defendant Chumley advised the Court that he was unable to retain counsel to represent Defendant OSI.  (Dkt. No. 127.)  It is well-established that a corporation cannot proceed *pro se*, and default judgment is appropriate where a corporation repeatedly fails to appear by counsel.  *Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 192 (2d Cir. 2006) (noting that "a corporation may not appear in a lawsuit against it except through an attorney, and . . . where a corporation repeatedly fails to appear by counsel, a default judgment may be entered against it pursuant to [Fed. R. Civ. P.] 55"); *see also New York State Teamsters Conference Pension and Ret. Fund v. Comac Builders Supply Corp.*, 06-CV-0208, 2008 WL 150515, at *1-4 (N.D.N.Y. Jan. 14, 2008) (Scullin, J.) (reviewing relevant caselaw, and concluding that overwhelming caselaw holds that a corporation may not appear in a lawsuit against it except through an attorney).

As a result, Plaintiff's motion for default judgment against Defendant OSI is granted.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 70) is **<u>GRANTED in part</u>** and **<u>DENIED in part</u>**, and decision on that motion is **<u>RESERVED in part</u>** in the following respects;

> (1) Plaintiff's motion for summary judgment on the issue of liability for actual damages is **<u>GRANTED</u>**;
>
> (2) Plaintiff's motion for summary judgment on the issue that the stipulated damages provision is enforceable is **<u>DENIED</u>**; and
>
> (3) the Court **<u>RESERVES</u>** decision on Plaintiff's motion for monetary damages;

and it is further

**ORDERED** that Defendants' counterclaims (Dkt. No. 54) are **DISMISSED**; and it is further

**ORDERED** that Defendants' motion to strike Plaintiff's reply (Dkt. No. 91) is **DENIED** as moot; and it is further

**ORDERED** that Plaintiff's motion for default judgment (Dkt. No. 120) is **GRANTED in part** and **DENIED in part** in the following respects;

> (1) Plaintiff's motion for default judgment is **GRANTED** against Defendant OSI; and
>
> (2) Plaintiff's motion for default judgment is **DENIED** against Defendant Chumley; and it is further

**ORDERED** that Defendant Chumley's motion to (1) permit him to represent himself *pro se* and (2) set aside the Clerk's Entry of Default against him (Dkt. Nos. 126-127) is **GRANTED**; and it is further

**ORDERED** that Plaintiff file a memorandum of law and any additional affidavits and exhibits necessary detailing its damages on its breach-of-contract claim **on or before APRIL 28, 2011**; and it is further

**ORDERED** that defendant's response to that submission is due **on or before MAY 28, 2011**; and it is further

**ORDERED** that the Clerk's Office shall serve this Decision and Order on Defendant Jonathan Chumley by regular mail at 9857 High Point Drive, Shreveport, LA 71106, and also at 10150 Stonehedge Drive, Shreveport, LA 71106.

Dated: March 28, 2011
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge